Argued and submitted February 11, 2014, reversed and remanded
April 20, petition for review denied September 15, 2016 (360 Or 400)

Paul George McKENZIE
and Dana Jeunea McKenzie,
husband and wife,
*Plaintiffs-Appellants,*

*v.*

A. W. CHESTERSON COMPANY, et al.,
*Defendants,*

*and*

WARREN PUMPS, LLC,
individually and as successor-in-interest to
Quimby Pump Company,
*Defendant-Respondent.*

Multnomah County Circuit Court
090607908; A145735

373 P3d 150

James S. Coon argued the cause for appellants. With him on the opening brief were Matthew Bergman, Brian Ladenburg, Glenn Draper, and Swanson Thomas & Coon. With him on the reply brief were Matthew Bergman, Brian Ladenburg, Glenn Draper, and Swanson, Thomas, Coon & Newton.

Laurie Hepler argued the cause for respondent. On the briefs were J. Michael Mattingly, Allen Eraut, and Rizzo Mattingly Bosworth PC.

Before Armstrong, Presiding Judge, and Egan, Judge, and Nakamoto, Judge pro tempore.

NAKAMOTO, J. pro tempore.

## NAKAMOTO, J. pro tempore

Plaintiff appeals in this product liability civil action resolved by summary judgment in favor of defendant Warren Pumps, LLC. Plaintiff's late husband, Paul McKenzie, served on two aircraft carriers during his naval career, working on and around various pumps that defendant had manufactured and sold to the United States Navy in the 1940s. In claims for strict product liability, negligence, and loss of consortium brought against defendant, plaintiff alleged that her husband had developed mesothelioma after his exposure to asbestos-containing replacement gaskets, insulation, and packing used with defendant's pumps. Plaintiff contended that it was foreseeable that those replacement items would be used with the pumps and that defendant should have warned of the dangers of asbestos exposure with the use of its pumps.[1] Defendant filed a summary judgment motion in which it argued, among other things, that, even if plaintiff could prove that McKenzie had been exposed to asbestos through the replacement items, plaintiff failed to adduce sufficient evidence that defendant had manufactured them or supplied them to the Navy and, therefore, that it was entitled to judgment in its favor on all claims as a matter of law. The trial court granted defendant's summary judgment motion on plaintiff's claims.

On appeal, plaintiff argues that defendant is subject to liability on all her claims because, at the time McKenzie worked around the pumps, they were in substantially the same condition as when defendant had sold them to the Navy and it was foreseeable that seamen would be exposed to asbestos through the replacement gaskets, packing, and insulation used with defendant's pumps, even though defendant had not manufactured or sold the replacements. On the issue presented as to plaintiff's strict product liability claim, a matter of first impression in Oregon, we conclude that the statute that governs strict product liability in

---

[1] Both McKenzie and plaintiff initiated the action in 2009 against multiple manufacturers and distributors, but McKenzie died during the course of this litigation. For ease of reference, we refer to plaintiff's decedent as McKenzie and refer only to plaintiff when discussing the claims and positions of both McKenzie and plaintiff. We also note that this appeal concerns only the limited judgment entered in favor of defendant.

Oregon permits plaintiff's theory of liability. We also conclude that plaintiff has adduced facts supporting the disputed causation element of her negligence claim. Finally, we conclude that the trial court erred in dismissing plaintiff's loss of consortium claim, which piggy-backed on the strict liability and negligence claims. Accordingly, we reverse and remand.

## I. FACTS

The material facts are primarily undisputed for purposes of this appeal from summary judgment. When they are not, we state the facts in the light most favorable to plaintiff, the nonmoving party. ORCP 47 C.

McKenzie served in the United States Navy for almost 20 years, retiring in 1972. During part of his naval career, McKenzie served on two steam-powered Essex Class aircraft carriers, the USS Boxer and the USS Hancock. During the 1940s, defendant had sold 51 pumps of numerous types that were installed on the USS Boxer and the same number of pumps that were installed on the USS Hancock. Both carriers went into service in 1944, and McKenzie worked aboard each carrier years later: on the USS Boxer from 1954 to 1959 and on the USS Hancock from 1968 to 1970.

Defendant's sales records indicated that some of defendant's pumps sold for those carriers originally had asbestos-containing gaskets, packing, or external insulation material. Defendant did not manufacture those items; rather, defendant purchased them from third parties. Defendant manufactured the pumps, and it sold the pumps with gaskets, packing, or insulation as "a complete package."

Defendant's corporate witness, Roland Doktor, testified that defendant designed the pumps and obtained the Navy's approval of pump design drawings. Doktor also explained that, if defendant's pumps had not met the Navy's specifications, they would have been rejected.

On the USS Boxer, McKenzie worked in and around boiler rooms, ascending through the ranks from Fireman to Boilerman Chief. The boiler rooms to which McKenzie was assigned contained at least seven of defendant's pumps.

McKenzie's responsibilities included overseeing the proper operation, maintenance, and repair of pumps, including those manufactured and sold by defendant. McKenzie's work on the USS Boxer exposed him to asbestos.

Part of McKenzie's work was to replace packing inside pumps, which sometimes involved his exposure to asbestos fibers. Packing was located on both ends of the pump and sometimes contained fibrous material, such as plant fiber or asbestos. McKenzie had to remove and replace packing multiple times. He did so as part of a major overhaul of the USS Boxer; he replaced packing every few months to maintain bilge pumps; and he disassembled the fire pump and changed its packing "a lot" of times because it was in his area.

McKenzie also worked on gaskets. Internal gaskets that defendant originally used within some of its pumps, which were regularly replaced, contained asbestos. Although he primarily worked with external flange gaskets, which were installed between a pump and the ship's piping and which defendant had not supplied to the Navy, McKenzie sometimes worked on internal gaskets.

In addition, McKenzie had to remove insulation on the outside of the pumps to service them, which exposed him to asbestos. Doktor testified that, as specified by the Navy, defendant insulated cylinders on defendant's steam pumps with "[i]nsulating material of 85 percent magnesia." The insulation around the steam pumps was then encased in sheet metal housing. (The Navy similarly insulated pipes and boilers on board the carrier.) Doktor explained that 85 percent magnesia "does have some asbestos material in it." He also noted that some pump cylinders were encased with an asbestos metallic cloth ring. When McKenzie had to replace packing on a pump valve, he first had to remove the external insulation.

McKenzie's job duties were different when he served aboard the USS Hancock. By that time, McKenzie was in charge of maintenance and operation of the boiler rooms and performed mostly administrative tasks. However, he still spent time in the fire rooms and boiler rooms and occasionally provided hands-on help as needed. In terms of engine

rooms, fire rooms, and equipment on the vessel, the USS Hancock was "exactly the same" as the USS Boxer.

Doktor testified that defendant would, if required by a specific Navy order, supply a set of replacement parts (onboard spares) made of the same material as the originals, with an initial pump delivery. The onboard spares included gaskets and packing but not external insulation. Neither party submitted evidence that, after delivery of the pumps, defendant sold replacement parts to the Navy for use on the USS Boxer or the USS Hancock.

Given when the aircraft carriers went into service, McKenzie was not exposed to asbestos from asbestos-containing gaskets, packing, or insulation supplied by defendant for its pumps. Both the USS Boxer and the USS Hancock had undergone overhauls by the time McKenzie served on them. The repair records for the USS Boxer detailed extensive pump maintenance, and the USS Hancock was overhauled or repaired at least eight times before McKenzie reported onboard. Defendant's documents showed that any original asbestos-containing gaskets and packing would have been removed and replaced during necessary maintenance and overhaul, and McKenzie himself believed that any pumps on the ships on which he served would have had gaskets and packing replaced before he ever encountered the equipment. Thus, for purposes of this appeal, plaintiff concedes in her reply brief that, although "McKenzie was exposed to asbestos when working on those pumps," asbestos-containing gaskets, packing, and insulation originally supplied with a pump defendant made and sold "would have been replaced with other asbestos parts that plaintiff did not prove were sold by [defendant]."

Defendant did not supply warnings with respect to the hazards of asbestos with any of its pumps that it sold to the Navy. Almost four decades after his retirement from the Navy, McKenzie was diagnosed with mesothelioma.

Plaintiff sued defendant and numerous other manufacturers and distributors, who, according to plaintiff, manufactured, sold, or distributed "asbestos-containing products or products that were used in conjunction with asbestos" at job sites where McKenzie worked. Plaintiff

asserted three claims: strict product liability, negligence, and loss of consortium. For her strict liability claim, plaintiff alleged that defendant sold "asbestos-containing products or products that were used in conjunction with asbestos, including, but not limited to pumps." Plaintiff also alleged that defendant's products were "unreasonably dangerous and defective" because (a) they "caused pulmonary disease and/or cancer if inhaled by individuals"; (b) they "continued to release asbestos fibers into the atmosphere" once installed; and (c) defendant "did not provide sufficient warnings and/or instructions of the harm caused by exposure to asbestos-containing products or adequately notify the public of [its] products' dangerous propensities." For her negligence claim, plaintiff alleged that defendant (1) distributed or sold asbestos-containing products when defendant knew, or should have known, about asbestos-related hazards; (2) failed to conduct adequate testing to determine the level of airborne asbestos fibers emitted by defendant's products; and (3) failed to provide adequate warnings about the dangers associated with the use of asbestos products and to advise individuals about how and when to use respiratory protection. Plaintiff's claim for loss of consortium was based on the allegations in her claims for strict product liability and negligence. For all claims, plaintiff alleged that McKenzie had developed malignant mesothelioma as a result of exposure to defendant's asbestos-containing products used at his work sites.

Defendant successfully moved for summary judgment on plaintiff's claims. As relevant to this appeal, defendant argued that it was entitled to a judgment in its favor because plaintiff had to, but could not, prove that McKenzie worked on or around the original gaskets, packing, or insulation that came with defendant's pumps or any onboard spare gaskets and packing that defendant may have sold to the Navy for the pumps. Although the trial court did not issue an opinion explaining its order granting defendant's motion, the parties agree on appeal that the trial court's decision turned on that argument. The trial court entered a limited judgment under ORCP 67 B dismissing plaintiff's claims, which plaintiff now appeals.

## II.  ANALYSIS

Plaintiff asserts three assignments of error, challenging summary judgment for defendant on each of her claims. When the material facts are not in dispute, as in this case, we review the trial court's grant of summary judgment for errors of law. *Delgado v. Del Monte Fresh Produce, N. A., Inc.*, 260 Or App 480, 493-94, 317 P3d 419, *rev den*, 355 Or 380 (2014).

### A.  *Strict Product Liability Claim*

In 1979, the legislature codified the law of strict liability by enacting ORS 30.920. *McCathern v. Toyota Motor Corp.*, 332 Or 59, 74, 23 P3d 320 (2001). The parties differ over the proper application of ORS 30.920(1) to plaintiff's product liability claim. In its entirety, ORS 30.920 provides:

"(1)   One who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

"(a)   The seller or lessor is engaged in the business of selling or leasing such a product; and

"(b)   The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

"(2)   The rule stated in subsection (1) of this section shall apply, even though:

"(a)   The seller or lessor has exercised all possible care in the preparation and sale or lease of the product; and

"(b)   The user, consumer or injured party has not purchased or leased the product from or entered into any contractual relations with the seller or lessor.

"(3)   It is the intent of the Legislative Assembly that the rule stated in subsections (1) and (2) of this section shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965). All references in these comments to sale, sell, selling or seller shall be construed to include lease, leases, leasing and lessor.

"(4) Nothing in this section shall be construed to limit the rights and liabilities of sellers and lessors under principles of common law negligence or under ORS chapter 72."

Plaintiff maintains that the unreasonably dangerous products relevant to liability under ORS 30.920(1) are the asbestos-containing pumps on the USS Boxer and USS Hancock that defendant manufactured and sold to the Navy in the 1940s. And, she notes, under ORS 30.920(1)(b), the seller of a product in Oregon is strictly liable for damage caused by that product if it is unreasonably dangerous and is expected to and does reach the user without substantial change in the condition in which it was sold. Thus, in plaintiff's view, it does not matter whether McKenzie encountered asbestos-containing replacement gaskets, packing, and insulation that others had sold to the Navy; instead, the salient issue is whether the pumps and McKenzie's use of them (including the exposure to asbestos in the gaskets, packing, and external insulation used with the pumps) were substantially the same as when defendant originally sold the pumps to the Navy. Plaintiff marshals support for her views of ORS 30.920(1) by reference to *Restatement (Second) of Torts* section 402A (1965) and specific comments to that section, given that ORS 30.920 tracks the wording of section 402A, *Two Two v. Fujitec America, Inc.*, 355 Or 319, 333, 325 P3d 707 (2014), and subsection (3) of ORS 30.920 provides that subsection (1) is to "be construed in accordance with" section 402A, "[c]omments a to m (1965)."

Applying her view of the law, plaintiff contends that she is entitled to a trial on her strict liability claim based on a theory of liability, permitted by ORS 30.920(1)(b), that the pumps that McKenzie encountered had not substantially changed from the time of sale in the 1940s. Plaintiff asserts that the record contains evidence that the pumps were substantially in their time-of-sale condition when McKenzie worked around them and that defendant knew about the likely continuing risk of pump users' exposure to asbestos-containing parts used with its pumps. Therefore, she concludes, defendant was required to warn users of dangers associated with the pumps even though the replacement gaskets, packing, and external insulation that McKenzie encountered were manufactured and supplied by others and not defendant.

Defendant urges us to reject plaintiff's theory of liability, first countering that plaintiff's starting position is wrong. In defendant's view, the relevant unreasonably dangerous products for purposes of ORS 30.920(1) were not its pumps, as plaintiff maintains; rather, they were the gaskets, packing, and insulation that contained asbestos. Defendant argues that it manufactured metal pumps, which did not cause McKenzie's injury. The only possible cause of McKenzie's injury was the asbestos-containing products used with the pumps that others had manufactured and sold to the Navy, and so a pump manufacturer like defendant cannot be held strictly liable for injury caused by the asbestos-containing gaskets, packing, or insulation. That defense theory has sometimes been termed the "bare metal defense," *see, e.g.*, *Quirin v. Lorillard Tobacco Co.*, 17 F Supp 3d 760, 768 (ND Ill 2014), although, as defendant's corporate witness acknowledged, defendant did not actually sell bare-metal pumps.

Our identification of the products at issue, then, is the threshold inquiry. Were the final products in plaintiff's failure-to-warn product liability claim defendant's pumps as delivered to the Navy in the 1940s, including asbestos-containing gaskets, packing, and insulation that defendant anticipated would be replaced with equivalent parts, or were they solely asbestos-containing gaskets, packing, and insulation that others had manufactured and sold to the Navy and that McKenzie encountered in the 1950s and 1960s?

For a number of reasons, we agree with plaintiff that the products in this case are the pumps as delivered to the Navy. First, that is what plaintiff alleged, *see Harris v. Northwest Natural Gas Company*, 284 Or 571, 573 n 2, 588 P2d 18 (1978) (accepting, in a product liability action, the plaintiff's allegation concerning the nature of the product at issue), and the summary judgment record contains evidence that defendant sold pumps with asbestos-containing parts, not bare metal. As the Maryland Court of Appeals stated in *May v. Air & Liquid Systems Corp.*, 446 Md 1, 27, 129 A3d 984, 999 (2015), *recons granted in part*, (Feb 19, 2016), *recons den*, (Feb 19, 2016), when it rejected the "product" argument that defendant makes in this case, "[c]ommon sense tells us that the pumps were what Respondents sold to

the Navy, and the gaskets and packing are included within that product."

Second, the terms of ORS 30.920(1) permit plaintiff's theory that the products at issue are defendant's pumps as sold to the Navy and that those products were unreasonably dangerous by virtue of defendant's failure to warn regarding hazards of using defendant's pumps. In accordance with ORS 30.920(1)(b), plaintiff's theory is that the pumps were unreasonably dangerous when sold and that the pumps were expected to and did reach users like McKenzie without substantial change in the condition in which they were sold.

Third, the comments to section 402A of the *Restatement* support plaintiff's view of ORS 30.920(1). Like ORS 30.920(1)(b), comment d provides that strict liability "extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user," such as "an automobile, * * * an airplane, * * * a power tool[.]" The examples in comment d support the idea that a seller may be strictly liable for a product that is dangerous when sold, even if component parts will, through wear and tear from use or regular maintenance, be later replaced. Plaintiff notes that comment g to section 402A of the *Restatement* provides that the rule stated in section 402A "applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Plaintiff's theory of liability is consistent with comment g, focused as it is on the product that defendant sold to the Navy.

Defendant does not offer an alternative text-based reading of ORS 30.920(1). Rather, defendant argues more broadly two points: (1) the bare-metal defense and its focus on component asbestos-containing products is consistent with Oregon precedent, citing *Griffith v. Blatt*, 334 Or 456, 51 P3d 1256 (2002), and *Weihl v. Asbestos Corporation, Ltd*, 204 Or App 255, 129 P3d 748, *rev den*, 342 Or 254 (2006), and (2) we ought to follow courts in several other jurisdictions, such as Washington and California, that accept the bare-metal defense and reject strict liability for a pump manufacturer's failure to warn pump users that there is a

risk from another manufacturer's asbestos-containing products used with the pumps.

As to defendant's first point, neither *Griffith* nor *Weihl* is helpful to the identification of the "product" at issue, and defendant's reliance on quotations taken from those cases is misplaced. Only one product, a prescribed lotion, was at issue in *Griffith*, 334 Or at 459, and the case presented the question whether, given ORS 30.920 and other product liability statutes, the "learned intermediary" doctrine barred imposition of strict liability on the pharmacist who had filled the prescription because the plaintiff's physician had received warnings concerning the product from the manufacturer. *Id.* at 465-67. In *Weihl*, an asbestos case, the question was whether the plaintiffs could offer evidence to oppose summary judgment motions when they had failed to provide certain product identification information to the defendants, contrary to the trial court's general order governing asbestos cases. 204 Or App at 267-68. Again, that case is not remotely analogous to this case, and the part of it that defendant quotes—that a plaintiff has the burden of persuasion on liability, including "the issue of defendants' responsibility for the specific asbestos products to which plaintiff allegedly was exposed"—is far too general to be helpful and to hold persuasive value to determining the "product" issue here.

Indeed, no prior case in Oregon covers the precise question in this case, and we view Oregon law as inconsistent with defendant's urging of the bare-metal defense. As *Griffith* makes clear, in Oregon, the statutory scheme "controls the disposition of strict liability claims." 334 Or at 466. Thus, in *Griffith*, the Supreme Court reviewed the statutes and observed that their text and context did not indicate a legislative intention to relieve a seller of strict liability for a product based on a manufacturer's warnings given to the prescribing physician, a doctrine that had developed in other states. *Id.* at 467. And, addressing defendant's second point next, we conclude that the primary out-of-state authorities that defendant cites appear to derive the bare-metal defense either from a limitation on a manufacturer's or seller's duty to warn that is contrary to the comments in section 402A of

the *Restatement* or else from the jurisdiction's own common law, developed without regard to the comments to section 402A.

We first address the companion Washington strict liability cases on which defendant relies, *Simonetta v. Viad Corp.*, 165 Wash 2d 341, 197 P3d 127 (2008), and *Braaten v. Saberhagen Holdings*, 165 Wash 2d 373, 198 P3d 493 (2008). The plaintiff in *Simonetta* performed maintenance work on an evaporator for desalinating sea water that the defendant's predecessor had sold to the Navy. 165 Wash 2d at 345, 197 P3d at 129. After that sale, another entity placed asbestos-containing external insulation manufactured by a different company on the evaporator, which ultimately led to the plaintiff's lung cancer. *Id.* On its facts, *Simonetta* differs from the present case because the evaporator had not been sold with the asbestos-containing insulation, but, in that case, the Washington Supreme Court adopted the substance of the bare-metal defense. The court explained that it had "rejected the language in comment h [to section 402A] that suggests a duty on the part of the seller to provide warnings as imposing a negligence principle upon the doctrine of strict liability." *Id.* at 356, 197 P3d at 135. The court held that the defendant's evaporator was not "the proximate cause" of the plaintiff's injury; as for the plaintiff's failure-to-warn theory, "there is no strict liability for failure to warn of the dangers inherent in another product"; and foreseeability of the placement of the insulation on the evaporator had "no bearing on the question of adequacy of warnings." *Id.* at 358, 197 P3d at 136. The court concluded that, because the defendant "was not in the chain of distribution of the dangerous product," it could not be held strictly liable for failure to warn. *Id.* at 363, 197 P3d at 138.

*Braaten* contains facts close to those in the present case. The plaintiff in *Braaten* alleged that, through his work as a pipefitter, he was exposed to asbestos-containing replacement gaskets and packing in pumps and valves sold to the Navy and asbestos-containing external insulation on the pumps and valves. 165 Wash 2d at 379-80, 198 P3d at 495. The Washington Supreme Court held that "the general rule" for common-law products liability cases that a product manufacturer has no duty "to warn of the

dangers of exposure to asbestos in other manufacturers' products," articulated in *Simonetta*, applied. 165 Wash 2d at 380, 198 P3d at 495. The no-duty general rule applied in *Braaten* because (1) the defendants "did not sell or supply" the asbestos-containing replacement parts that the plaintiff encountered or "otherwise place them in the stream of commerce" and (2) the defendants did not specify asbestos-containing packing and gaskets for use with the pumps and valves. *Id.* at 380, 198 P3d at 495-96. The court in *Braaten* further held that whether the defendant manufacturers knew that replacement parts "would or might contain asbestos makes no difference," again citing *Simonetta*. 165 Wash 2d at 391, 198 P3d at 501.

We do not accept the Washington cases as persuasive because they are based on reasoning and case law that does not take into account, as we must, an interpretation of ORS 30.920(1) that includes the consideration—not the rejection—of the comments to section 402A. Comment h, in part, provides:

"A product is not in a defective condition when it is safe for normal handling * * *. If the injury results from abnormal handling * * *, the seller is not liable. Where, however, [the seller] has reason to anticipate that danger may result from a particular use, * * * [the seller] may be required to give adequate warning of the danger (see Comment j), and a product sold without such warning is in a defective condition.

"The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from foreign objects * * *, or from the way in which the product is prepared or packed. No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole."

As plaintiff puts it, "[h]aving reason to anticipate danger from a particular use" is the test under comment h.

Comment j provides, in part, that "to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container,

as to its use." Comment j further states that, if, for example, a product contains an ingredient

> "whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if [the seller] has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger."

Under Oregon law, comments h and j to section 402A of the *Restatement* apply to a product liability claim based on the failure to warn. *Griffith,* 334 Or at 467 (stating that, pursuant to ORS 30.920(3), the court was obliged to construe ORS 30.920(1) in accordance with comments h and j).[2] A seller subject to Oregon law "may be required to give an adequate warning of the product's danger to a consumer when the seller has knowledge or should have knowledge of the danger." *Id.* at 467-68. Oregon has long recognized that sellers of products have a duty to provide adequate warnings about nonobvious risks of injury associated with the use of their products when they know, or reasonably should know, of those risks of injury. *See, e.g., Benjamin v. Wal-Mart Stores, Inc.,* 185 Or App 444, 454-55, 61 P3d 257 (2002), *rev den,* 335 Or 479 (2003) (collecting cases).

In contrast, *Simonetta* (and therefore *Braaten*) rests in significant part on the Washington Supreme Court's rejection of comment h to section 402A. As the Washington Supreme Court explained in *Simonetta,* it rejects the idea that, under Washington law, a seller is charged with the duty to warn when it knows or by foresight should know of the danger of use of the product. 165 Wash 2d at 356-58, 197 P3d at 135.

Nor are we persuaded by defendant's reliance on the California Supreme Court's decision in *O'Neil v. Crane Co.,* 53 Cal 4th 335, 266 P3d 987 (2012), for defendant's contention that we must reject plaintiff's theory of liability as a matter of law because defendant did not supply

---

[2] The Maryland Court of Appeals similarly concluded that, because strict liability claims in Maryland are governed by section 402A and its official comments, comment j applied to failure-to-warn claims. *May,* 446 Md at 23, 129 A3d at 997.

the asbestos-containing replacement gaskets, packing, and insulation that McKenzie encountered aboard the USS Boxer and the USS Hancock. As with the Washington cases, *O'Neil*—which relies, in part, on the Washington cases as "instructive"—is a no-duty case (with some exceptions) that is divorced from the considerations that we must take into account under Oregon's statutory scheme controlling strict product liability claims. 53 Cal 4th at 355-56, 266 P3d at 1000-01.

Defendant was a party in *O'Neil*. The plaintiffs made allegations, similar to plaintiff's allegations in this case, that defendant and a valve manufacturer, Crane Co., were liable for the death of the decedent because he was exposed to asbestos in internal gaskets and packing and external insulation used with pumps and valves that the decedent worked on while serving on Navy ships. 53 Cal 4th at 342, 266 P3d at 991. The plaintiffs went to trial on two types of product defects: defective design and failure to warn. *Id.* at 348, 266 P3d at 995. The trial court granted the defendants' motion for nonsuit at the close of the evidence presented at trial. *Id.* at 346, 266 P3d at 993-94.

On review, the California Supreme Court held that a product manufacturer generally "may not be held liable in strict liability or negligence for harm caused by another manufacturer's product," *id.* at 342, 266 P3d at 991, but articulated two exceptions. A manufacturer would be strictly liable if its "own product contributed substantially to the harm" or if it "participated substantially in creating a harmful combined use of the products." *Id.*

The court explained that California courts had never held a manufacturer liable for failure to warn about uses of its product in conjunction with another product that is unsafe. *Id.* at 351-52, 266 P3d at 997-98 (discussing cases). The California Supreme Court viewed the replacement gaskets, packing, and insulation as additional pieces of equipment added after sale of the pumps that the purchaser may or may not use. *Id.* at 352, 266 P3d at 998. And, the court noted, "California law does not impose a duty to warn about dangers arising entirely from another manufacturer's product, even if it is foreseeable that the products will be used

together." *Id.* at 361, 266 P3d at 1004. Thus, *O'Neil* provides a manufacturer and seller like defendant with an exemption from an obligation to warn because the replacement gaskets, packing, and insulation encountered by McKenzie were manufactured and sold by third parties—regardless of whether the defendant knew that the replacements, like the originals, would contain harmful asbestos.

The *O'Neil* court resolved the action by concluding that the exceptions to the general no-duty rule in California did not apply. The court observed that the record did not support the plaintiffs' theory that the valves and pumps were designed to be used with asbestos-containing components; instead, the evidence established that "the Navy could have chosen to replace worn gaskets and seals in defendants' products with parts that did not contain asbestos." *Id.* at 350, 266 P3d at 996. Thus, in the court's view, "the pumps and valves were not 'necessarily' used with asbestos components" and did not cause or contribute to release of asbestos fibers. *Id.* at 361, 266 P3d at 1004.

The no-duty rules expressed in the Washington and California cases not only contradict the principle that a seller who foresees harm from use of the seller's product has a duty to warn the user, the principle expressed in comment h, but to some degree undermine the policy for statutory strict liability articulated in comment c to section 402A. Comment c to *Restatement (Second) of Torts* section 402A explains that public policy demands that sellers of products, being in a better position than individuals in the consuming public, should bear the cost of accidental injuries that their products cause:

> "On whatever theory, the justification for strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has a right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production

against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products."

The Washington and California courts announced common-law rules that favor sellers by changing the duty-to-warn default to a no-duty default when a seller, who knows of the danger to users, sells an unreasonably dangerous product containing dangerous component parts made by others that will be replaced with like dangerous component parts made by others.

In sum, the bare-metal defense does not bar plaintiff, as a matter of law, from pursuing her theory under ORS 30.920(1) that defendant is strictly liable for failing to warn users of the danger of asbestos in the products that it sold to the Navy—pumps with asbestos-containing gaskets, packing, and external insulation—because the pumps were expected to, and did, reach users without substantial change in the condition in which they were sold.[3]

Defendant next contends that, even assuming for purposes of summary judgment the potential application of plaintiff's theory of liability—that defendant's pumps as originally supplied to the Navy were unreasonably dangerous products by virtue of asbestos-containing gaskets, packing, or insulation included and used with the pumps—it is undisputed that McKenzie was not injured by exposure to any of those materials. Thus, defendant concludes, it is not liable because it was not the seller of an unreasonably dangerous product that caused injury to McKenzie.

---

[3] Our decision rejecting the no-duty defense based on replacement parts supplied by third parties is in accord with the decisions of courts in other jurisdictions that take into account the comments to section 402A of the *Restatement*. *See May*, 446 Md at 27-28, 129 A3d at 999-1000 (because the pumps sold to the Navy contained asbestos, asbestos was essential to their operation and needed periodic replacement, and it was dangerous, entry of summary judgment in favor of the defendants was error); *Berkowitz v. A.C. and S., Inc.*, 288 AD2d 148, 149, 733 NYS2d 410, 411-12 (NY App Div 2001) (declining to hold that pump manufacturer necessarily had no duty to warn when it knew that insulation used with its pumps would be made of asbestos and the government had specifications that required such insulation, even though pump manufacturer did not manufacture or install the insulation).

It appears that the argument is a restated version of defendant's primary contention that the only unreasonably dangerous products at issue are asbestos-containing gaskets, packing, and insulation. If that is the argument, we reject it for the reasons stated above.

However, in light of plaintiff's theory of liability for failure to warn, defendant may also be understood to argue either that (1) the pumps that McKenzie encountered were not in substantially the same condition as when defendant sold them or (2) the record does not support a conclusion that defendant expected that replacement gaskets, packing, and insulation likely would contain asbestos, as required under ORS 30.920(1)(b). *See May*, 446 Md at 26, 129 A3d at 999 (recognizing that "the duty to warn is only absolved if there is substantial modification to the product between the time of sale and when the injured party encountered the product"). With that understanding of defendant's argument, we turn to the summary judgment record in this case.

Plaintiff argues that there is evidence in the summary judgment record that defendant's pumps were expected to reach users such as McKenzie in the condition originally sold, that is, with asbestos-containing gaskets, packing, or insulation, albeit replaced over time with asbestos-containing products that were made and supplied by others. Plaintiff points out that defendant designed pumps with asbestos-containing parts in accordance with Navy specifications and shipped pumps with those parts and, in some cases, with spare asbestos-containing gaskets and packing as well.

Defendant acknowledges that the record contains evidence that the Navy specified—indeed, strictly required—the use of asbestos-containing gaskets, packing, and external insulation for some of its pumps on the USS Boxer and the USS Hancock. Thus, it is of no moment that defendant highlights a lack of evidence in the record that defendant's pumps required the use of asbestos-containing internal replacement parts to operate. Regardless of whether the pumps might or might not operate without asbestos-containing gaskets and packing, plaintiff adduced evidence

that defendant had every reason to know that the Navy, having required the placement of asbestos-containing parts in and on the exterior of some pumps by defendant's design and pursuant to the Navy's specifications, would continue to use such parts in and on the pumps defendant supplied to the Navy for the Essex Class aircraft carriers on which McKenzie served.

Because plaintiff's evidence was sufficient to defeat defendant's summary judgment motion on her theory that the pumps McKenzie encountered were in substantially the same condition as when defendant sold them and that defendant expected that replacement gaskets, packing, and insulation likely would contain asbestos, we conclude that the trial court erred by granting defendant's motion for summary judgment on plaintiff's strict liability claim.

B.  *Negligence Claim*

As noted earlier, plaintiff alleged that defendant was negligent because it sold asbestos-containing products; knew, or should have known, about asbestos-related hazards; but failed to provide adequate warnings about the dangers associated with asbestos and to advise users about how and when to use respiratory protection. In her second assignment of error, plaintiff contends that, in light of *Restatement (Second) of Torts* section 388 (1965), controlling Oregon case law, and the summary judgment record, the trial court incorrectly granted defendant's summary judgment motion on her negligence claim. We conclude that the trial court erred.

In *Hoyt v. Vitek, Inc.*, 134 Or App 271, 287, 894 P2d 1225 (1995), we held that section 388 of the *Restatement* defines the duty owed by one whose status is that of a supplier of product. *Accord Waddill v. Anchor Hocking, Inc.*, 149 Or App 464, 475, 944 P2d 957 (1997), *rev'd on other grounds*, 330 Or 376, 8 P3d 200 (2000); *see also Wood v. Ford Motor Co.*, 71 Or App 87, 90, 691 P2d 495 (1984), *rev den*, 298 Or 773 (1985) (stating that, under section 388, a seller "is negligent if it fails to warn of those dangerous propensities of which it knows or reasonably should know"). *Restatement* section 388 provides, in part:

"One who supplies * * * a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel * * * for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

"(a)   knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

"(b)   has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

"(c)   fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

As with her strict liability claim, plaintiff contends that the record would permit a jury to find that defendant knew that the use of its pumps with asbestos-containing gaskets, packing, and insulation "was both likely and likely to be dangerous." She further notes that defendant has not argued that the dangers of asbestos were obvious to McKenzie in the 1950s and 1960s, and, citing *Harris*, 284 Or at 579-80 (holding that the plaintiff had stated a claim against the defendant gas company for negligent failure to warn of danger that natural gas could ignite volatile substances in a garage), she concludes that the trial court erred in dismissing her negligence claim.

Defendant does not dispute that *Restatement* section 388 applies to plaintiff's negligence claim and that it is a supplier under section 388. And, defendant acknowledges that its summary judgment motion did not raise an issue as to whether the danger of asbestos was obvious to McKenzie. Defendant instead urges us to affirm by reformulating plaintiff's claim, positing that she is not in actuality complaining of harm caused by probable use of the "chattel," namely, "the pump." Rather, defendant argues, she actually "complains of harm caused by asbestos dust" from replacement parts sold by nonparties. Thus, in defendant's view, plaintiff failed to adduce evidence sufficient to prove a causal link between its conduct and McKenzie's injury. In support of that argument, which is similar to its argument as to plaintiff's

strict liability claim, defendant relies again on *Braaten* and *Simonetta*, in which the Washington Supreme Court held that the duty to warn in negligence cases is limited to those in the chain of distribution. *Braaten*, 165 Wash 2d at 397, 197 P3d at 504; *Simonetta*, 165 Wash 2d at 363, 197 P3d at 138. Although defendant asserts that its argument concerns factual, "but for" causation, its reliance on those cases suggests instead that defendant is relying on the concept of proximate, or legal, causation.

To the extent that defendant indeed argues that plaintiff cannot prove that defendant's failure to warn of the dangers of asbestos was a but-for cause of McKenzie's exposure to airborne asbestos, because defendant did not sell or make the replacement items that McKenzie encountered, we disagree. Plaintiff's theory is that defendant knew that the maintenance of the pumps required removal and replacement of gaskets, packing, and insulation; that those parts—originals and replacements—would contain asbestos; that the maintenance work would cause workers such as McKenzie to be exposed to airborne asbestos; and that defendant's failure to warn McKenzie of the need for and how to use respiratory protection was a but-for cause of his injury. Defendant does not argue that the record is devoid of evidence to support plaintiff's contention that a failure to warn on defendant's part played a part in McKenzie's exposure to asbestos and subsequent illness and death.

We also reject what appears to be defendant's primary argument—that is, that the "bare metal" or "no duty" defense bars its liability on plaintiff's negligence claim. In Oregon, absent a special status, relationship, or standard of conduct, *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), liability in negligence is based on foreseeability. *Lasley v. Combined Transport, Inc.*, 351 Or 1, 7, 261 P3d 1215 (2011). "When a defendant's negligence is a factual cause of harm to the plaintiff, the defendant is subject to liability to the plaintiff as long as the harm that the plaintiff suffered was a reasonably foreseeable result of the defendant's negligence." *Id.* The only argument defendant appears to make in the briefing based on foreseeability is a statement in passing that defendant was unable "to foresee,

in the early 1940s, that dust inhaled from other manufacturers' asbestos-containing parts" could cause McKenzie's injury. For the reasons explained above with respect to plaintiff's strict liability claim, we conclude that the record suffices to defeat summary judgment on that score. A jury could find that defendant knew that the Navy required the placement of asbestos-containing parts in and on the exterior of some pumps by defendant's design and pursuant to the Navy's specifications. A jury could also find it was foreseeable to defendant that the Navy would continue to use such parts in and on the pumps on which McKenzie worked and that McKenzie would be exposed to asbestos as a result. Accordingly, we conclude that the trial court erred in granting defendant's summary judgment motion on plaintiff's negligence claim.

## C. *Loss of Consortium Claim*

Plaintiff's claim for loss of consortium was based on the allegations supporting her product liability and negligence claims. Given our conclusions that the trial court erred by granting defendant's summary judgment motion and dismissing those claims, we conclude that trial court should have denied the motion as to plaintiff's loss of consortium claim as well. We therefore reverse the judgment and remand for further proceedings.

Reversed and remanded.