22 April 1, 2026 No. 229

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Sonja BOHR,
Tamara Barnes, Karen Foglesong, and Mary Wood,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Respondents,*

*v.*

TILLAMOOK COUNTY CREAMERY ASSOCIATION,
an Oregon cooperative corporation,
*Defendant-Appellant.*

Sonja BOHR,
Tamara Barnes, Karen Foglesong, and Mary Wood,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellants,*

*v.*

TILLAMOOK COUNTY CREAMERY ASSOCIATION,
an Oregon cooperative corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
19CV36208; A175575

On remand from the Oregon Supreme Court, *Bohr v. Tillamook County Creamery Association*, 373 Or 343, 567 P3d 413 (2025).

Argued and submitted on remand February 19, 2026.

Michael Sandmire argued the cause for appellant-respondent. Also on the briefs were Alexandra M. Shulman, Daniel L. Lis, and Buchalter Ater Wynne.

Nadia H. Dahab argued the cause for respondents-appellants. Also on the answering brief were David F. Sugerman and Sugerman Law Office; Tim Quenelle and Tim Quenelle PC; and Kelsey Eberly (California), Amanda Howell (Texas), and Animal Legal Defense Fund (California). Also on the supplemental brief were David Sugerman and Sugerman Dahab; Tim Quenelle and Tim Quenelle PC; Amanda Howell (Texas) and Animal Legal Defense Fund (California).

Before Tookey, Presiding Judge, Lagesen, Chief Judge, and DeVore, Senior Judge.

LAGESEN, C. J.

Reversed and remanded.

**LAGESEN, C. J.**

We consider this putative class action under Oregon's Unlawful Trade Practices Act (UTPA) for the second time, in this instance on remand from the Oregon Supreme Court. *Bohr v. Tillamook County Creamery Assn.*, 321 Or App 213, 516 P3d 284 (2022) (*Bohr I*); *Bohr v. Tillamook County Creamery Assn.*, 373 Or 343, 567 P3d 413 (2025) (*Bohr II*). Together, those decisions supply a detailed background of the course of this case to date, and we write from the premise that readers of this decision are acquainted with the previous decisions.

## I.   BACKGROUND

Plaintiffs allege that defendant Tillamook County Creamery Association's advertising about its dairy products was misleading in ways that violated three provisions of the UTPA: ORS 646.608(1)(b) (causing likelihood of confusion or of misunderstanding regarding the source of goods); ORS 646.608(1)(d) (using deceptive representations or designations of geographic origin in connection with goods); and ORS 646.608(1)(e) (representing that goods have qualities and characteristics, including ingredients, that they do not have). Plaintiffs further allege that the asserted violations caused them to suffer an "ascertainable loss" under ORS 646.638. The trial court dismissed the complaint to the extent that it purported to assert claims on behalf of a class, concluding that plaintiffs were required to allege that they relied on the asserted violative conduct in purchasing defendant's products, and, further, that plaintiffs failed to adequately allege reliance by class members. The court concluded, however, that the individual plaintiffs' allegations sufficiently stated claims under each of the identified UTPA provisions.

As ORS 19.225 allows in putative class actions, the trial court certified to us seven questions that the court determined were "controlling question[s] of law" that would benefit from interlocutory resolution. When this case was first before us, we answered four of those questions in defendant's favor (1, 2, 3 and 5) and, based on those answers, affirmed the trial court's order of dismissal with respect to

the class claims, and remanded to the trial court to proceed with the case with respect to the individual plaintiffs. *Bohr I*, 321 Or App at 224-25, 237-49. In so doing, we concluded that one of plaintiffs' theories of relief (the price inflation theory) was not tenable and that the other two theories (inducement and prohibited transaction) required plaintiffs to plead—and ultimately prove—reliance. *Id*. at 249. As a result of those determinations, we did not reach the other questions certified to us (4, 6 and 7). We reasoned that, under the circumstances, they no longer presented controlling questions of law with respect to the class action. *Id*. at 226-28.

       The Supreme Court allowed review of our decision and reversed our decision insofar as we had held that plaintiffs were required to plead reliance for purposes of their "price inflation" and "prohibited transaction" theories of recovery:

> "We conclude that, for their claim alleging violations of ORS 646.608(1)(b), (d), and (e), where plaintiffs allege that they suffered ascertainable loss in the form of paying a 'premium' price for Tillamook's dairy products due to Tillamook's conduct that inflated the market value of those products, plaintiffs and the class members need not plead that they relied upon Tillamook's representations. Plaintiffs' allegations that they purchased 'misbranded' and 'illegally advertised' goods in violation of federal and state law also do not require plaintiffs and the class members to plead reliance."

*Bohr II*, 373 Or at 371. The Court remanded to us for further proceedings. *Id*. Upon plaintiffs' request, we received supplemental briefing and heard oral argument from the parties regarding the effect of the Supreme Court's decision on questions 4, 6 and 7—the questions we previously left unanswered. Those questions are as follows:

> "4a.   To establish ascertainable loss under ORS 646.638(1) based upon their theory that Plaintiffs and the members of the putative class overpaid for the Tillamook products compared to competing brands, must Plaintiffs and the members of the putative class plead and prove which Tillamook product(s) Plaintiffs and the members of the putative class purchased and at what cost, as well as the cost of the proper

comparator product(s) available at the time of their respective purchases?

"4b.   If the answer to the foregoing question is 'no,' must Plaintiffs and the members of the putative class nonetheless plead and prove which Tillamook product(s) Plaintiffs and the members of the putative class purchased and at what cost in order to provide the basis for any 'inference' of ascertainable loss?"

\* \* \* \* \*

"6.   Whether Plaintiffs' claim under ORS 646.608(1)(b) fails on the basis that the term 'source' in that subsection refers to the company that sells the goods at issue, not the geographic origin of an ingredient used to make the goods, and not the supplier of an ingredient used to make the goods."

"7.   Whether Plaintiffs' claim under ORS 646.608(1)(b) fails on the basis that the meaning of 'goods' in that subsection does not include an ingredient used to make the goods, in this case, milk."

For the reasons that follow, we answer both parts of question 4 in the negative. In view of that conclusion, and accounting for the Supreme Court's determination that plaintiffs are not required to allege reliance for two of their theories, we reverse the trial court's order dismissing the class claims for failure to state a claim.

That determination, which resurrects the potential class claims, means that questions 6 and 7 are potentially controlling questions for purposes of ORS 19.225, so we answer them. We answer each in the affirmative and conclude that, as pleaded, the allegations in the complaint do not state a claim under ORS 646.608(1)(b). We remand for further proceedings consistent with that conclusion, and our conclusion that plaintiffs have sufficiently alleged an ascertainable loss.

## II.   ANALYSIS

A.   *Ascertainable Loss*

We start with question 4 which, as noted, asks about the standard for pleading and proving an "ascertainable loss" within the meaning of ORS 646.638(1).

As an initial matter, to the extent question 4 asks us to determine what *proof*—in addition to pleading—is required, it is beyond the scope of this appeal. Under ORS 19.225, the only questions before us are the ones that are involved in the order on appeal.

> "When a circuit court judge, in making in a class action under ORCP 32 an order not otherwise appealable, is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order to the Court of Appeals * * *."

ORS 19.225. Here, the order on appeal comes from a motion to dismiss for failure to state a claim pursuant to *former* ORCP 21 A(1)(8) (2019), *renumbered as* ORCP 21 A(1)(h) (2022). Because the order is limited to the pleadings, so, too, is our inquiry. *See Bohr II*, 373 Or at 370 ("In this ORCP 21 A posture, * * * a court is required to assume that plaintiffs will be able to adduce evidence in support of their allegation that Tillamook's false representations had the effect of systematically inflating the prices of its goods across the market.").

Having determined that questions of proof are not properly before us, we turn to the question whether plaintiffs are required to plead facts beyond what they have already pleaded to withstand a motion to dismiss for failure to state a claim under ORCP 21 A(1)(h) challenging the adequacy of their allegations supporting their claim of "ascertainable loss" under ORS 646.638(1).

The Supreme Court has "interpreted the term 'ascertainable loss' to mean, generally, any determinable loss, even a loss that cannot be measured directly." *Clark v. Eddie Bauer LLC*, 371 Or 177, 185, 532 P3d 880 (2023) (internal quotation marks omitted). "Whenever a consumer has received something other than what he bargained for, he has suffered a loss of money or property. That loss is ascertainable if it is measurable even though the precise

amount of the loss is not known." *Id.* at 193 (internal quotation marks omitted). In view of *Clark*'s construction of the phrase "ascertainable loss," then, we understand the question to be whether plaintiffs have alleged a "determinable loss."

They have. The allegations in the complaint, in plain and simple terms, are that plaintiffs overpaid for defendant's dairy products because of defendant's deceptive advertising. Plaintiffs allege that "[c]onsumers increasingly seek out and are willing to pay more for products that they perceive as being ecofriendly" and "through its marketing, Tillamook is capitalizing on a sea change in consumer purchasing preference." They further allege that "[c]onsumers also seek out products made by small-scale farmers in order to support non-industrialized farming, to eschew products that contribute to corporate control of the food system, and support products that are environmentally sustainable." The named plaintiffs each state that they "regularly seek[] out, and [are] willing to pay more for, dairy products that [they] perceive[] as being more humane and coming from small, pasture-based dairies." Plaintiffs allege that they paid an "inflated price based upon the represented increased economic market value of [defendant's] products" and as such, plaintiffs "paid more than they otherwise would have paid for Tillamook dairy products." Plaintiffs further allege that they "overpaid for the Tillamook dairy products because the dairy products were not as represented." To support their allegation that "[d]efendant's illegal marketing and sales prices have led plaintiffs and members of the class to routinely pay more for Tillamook dairy products, as compared to national and generic brands," plaintiffs identified several Tillamook products from various retailers and compared them to other brands those retailers sell, which shows Tillamook products sold at a higher price. In our view, those alleged overpayments easily and adequately allege an "ascertainable loss" under *Clark* in a manner sufficient to withstand a motion to dismiss under ORCP 21.

Defendant's arguments otherwise appear to rest largely on concerns that the pleadings do not divulge sufficient information to permit preparation of a defense. Those

concerns are not unreasonable, but they are concerns more appropriately addressed by a motion to make more definite and certain than a motion to dismiss. In that regard, we note that defendant filed such a motion. In view of its prior disposition, the trial court has not addressed that motion; whether to grant it is a matter of discretion for the trial court in the first instance. *See Weihl v. Asbestos Corporation, Ltd*, 204 Or App 255, 266, 129 P3d 748 (2006) ("it would have been within the trial court's discretion, in ruling on a motion under ORCP 21 D, to require plaintiff to plead" with reasonable particularity any alleged exposures to asbestos-containing products)

In addition, it is difficult to see how plaintiffs will be able to demonstrate that this case satisfies the standards for proceeding as a class action without, at a minimum, identifying the products that they purchased. As the Supreme Court explained in this case, at the class-certification stage, the trial court will have to go "behind the pleadings to the extent necessary to resolve the class claims." *Bohr II*, 373 Or at 370 (internal quotation marks omitted). For example, plaintiffs will have to meet the requirements for class certification under ORCP 32 A and "the court, as set out in ORCP 32 B, must also find that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy."[1] *Migis v. AutoZone, Inc.*, 282 Or App 774, 781-82, 387 P3d 381 (2016), *adh'd to in part on recons*, 286 Or App 357, 396 P3d 309 (2017) (emphasis in original; internal quotation marks omitted). Specifically, the predominance inquiry under ORCP 32 B(3) asks, "how central are the common questions, and will common proof resolve" the

---

[1] ORCP 32 A provides:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if:

"A(1) The class is so numerous that joinder of all members is impracticable;

"A(2) There are questions of law or fact common to the class;

"A(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class;

"A(4) The representative parties will fairly and adequately protect the interests of the class; and

"A(5) In an action for damages, the representative parties have complied with the prelitigation notice provisions of section H of this rule."

issues.[2] *Pearson v. Philip Morris, Inc.*, 358 Or 88, 110, 361 P3d 3 (2015) (internal citation omitted). "In practical terms, the inquiry is designed to determine if proof as to one class member will be proof as to all, or whether dissimilarities among the class members will require individualized inquiries." *Id.* Thus, to permit the trial court to meaningfully evaluate whether this case properly may proceed as a class action, plaintiffs may well be required to show what products the plaintiffs and members of the class purchased, at what price, and, depending on theory, to identify competitor products and the prices for those products, something that will better enable defendant to prepare a defense both to the request for class certification and to the claims. In the words of the Supreme Court, though, it is "premature" at this stage to resolve these types of questions related to class certification. *Bohr II*, 373 Or at 369.

B.   *"Source" and "Goods."*

    We turn to questions 6 and 7. In the order on appeal, the trial court also denied defendant's motion to dismiss plaintiffs' claim under ORS 646.608(1)(b), which makes it an unlawful trade practice to "cause[] a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods, and services." Plaintiffs allege that defendant violated this provision (and the other UTPA provisions) by causing confusion about the origins of the ingredients in defendant's products in view of the fact that defendant's products are made from milk produced in "massive factory farms" located in Boardman, Oregon, and not exclusively from milk produced in small family farms in Tillamook County.

    Defendant moved to dismiss that claim on the ground that confusion about geographic location and processing

---

    [2] ORCP 32 B(3) provides:

    "An action may be maintained as a class action if the prerequisites of section A of this rule are satisfied, and in addition, the court finds that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to this finding include:

    "*****;

    "B(3) The extent to which questions of law or fact common to the members of the class predominate over any questions affecting only individual members[.]"

methods does not constitute confusion about a "source" of "goods" within the meaning of ORS 646.608(1)(b). Defendant contended that "source" within that provision refers to the maker or producer of the goods, not to where or how they were made. In addition, defendant contended that "goods" within that provision does not encompass the ingredients or component parts of a product, such that plaintiffs' allegations that defendant created confusion regarding the production of the milk used to make defendant's products does not state a claim that defendant created confusion about "goods." In other words, in defendant's view, the term "goods" in ORS 646.608(1)(b) refers to defendant's dairy products, not to the milk that defendant uses to make those products. The trial court denied defendant's motion, concluding that plaintiffs' allegations stated a claim. At defendant's request, however, it certified two questions to us—questions 6 and 7 set forth above—in connection with that ruling.

For the following reasons, we conclude that, to state a claim that a defendant caused a "likelihood of confusion *** as to the source of *** goods" under ORS 646.608 (1)(b), plaintiffs must allege facts showing that the defendant caused a likelihood of confusion as to the supplier of a product that the defendant is alleged to have made available for personal, family or household purposes. Although allegations that a defendant engaged in misleading conduct regarding the origins of a product's ingredients, the geographic origin of a product or its ingredients, or the nature of the operations used to produce a product or its ingredient, may give rise to claims under other provisions of ORS 646.608(1), including, as here, ORS 646.608(1)(d) and (e), such allegations do not state a claim under ORS 646.608(1)(b), which targets conduct that creates a likelihood of confusion as to *who* placed a particular product into commerce.

We start with "goods" (question 7). We conclude that the word "goods" refers to the products that a defendant is alleged to have made available for personal, family, or household purposes, not to the ingredients or component parts of any such products. The UTPA does not provide a standalone definition of the word "goods." In the commercial setting, however, the word ordinarily refers to whole

products, not the component parts of a product. *Webster's* relevantly defines "goods" to be products:

> "tangible movable personal property having intrinsic value usu. excluding money and other choses in action but sometimes including all personal property and occas. including vessels and even industrial crops or emblements, buildings, or other things affixed to real estate but agreed to be severed: chattels, wares, merchandise, food products, chemical compounds, and agricultural products."

*Webster's Third New Int'l Dictionary* 978 (unabridged ed 2002). That definition undercuts plaintiffs' contention that the word "goods" should also mean the component parts or ingredients of a particular product because it speaks in terms of things commonly viewed as wholes, not parts.

Context reinforces the conclusion that the legislature used the word "goods" in the ordinary way to refer to a product not parts. It does so in two ways.

First, although the UTPA does not supply a standalone definition of "goods," it does define the phrase "[r]eal estate, goods or services." ORS 646.605(6) provides in relevant part:

> "'Real estate, goods or services' means those that are or may be obtained for personal, family or household purposes, or that are or may be obtained for any purposes as a result of a telephone solicitation, and includes loans and extensions of credit, and franchises, distributorships, and other similar business opportunities, but does not include insurance."

ORS 646.605(6)(a). The structure of that definition suggests that the legislature intended the word "good" in the UTPA to refer to a product in the form marketed to consumers—something that is or may be obtained for personal, family or household purposes (or for other purposes by way of telephone solicitation).

Second, the UTPA contains at least one provision that differentiates between "goods" and their ingredients. Saliently, ORS 646.608(1)(e) makes it an unlawful practice to represent that "goods" have "characteristics," "ingredients," or "qualities" that the goods do not have. The legislature's

differentiation between "goods" and their "characteristics," "ingredients," and "qualities" further demonstrates that, for purposes of the UTPA, the legislature viewed the word "goods" as referring to a whole product, separate and distinct from the product's component parts.

The parties have not drawn our attention to any legislative history pointing in a different direction and we are aware of none. Accordingly, we conclude that the word "goods" in ORS 646.608(1)(b) refers to the whole products that defendant is alleged to have made available "for personal, family, or household purposes." ORS 646.605(6)(a). It does not refer to the ingredients or component parts of those products.

We turn to "source." Plaintiffs argue that the word "source" in ORS 646.608(1)(b) should be construed broadly to encompass anything related to the origin of a good, including both the geographic origin of the good and the manufacturing processes that produce the good. Defendant argues that the word should be construed narrowly to refer to the company selling the product. We conclude that the text, context, and legislative history of the provision demonstrate that the word "source" refers to the supplier of a good, and, therefore, does not refer to either the geographic origins of a good or the manufacturing processes that produced it.

The ordinary meaning of the word "source" favors neither side. As relevant to this context, *Webster* defines "source" as a "generative force or stimulus: CAUSE, INSTIGATOR," as a "a point of origin or procurement: FOUNTAIN, SUPPLIER," and as "a point of emanation." *Wesbter's* at 2177. The concept of a "generative force" could capture manufacturing processes and the concept of a "point of origin" or "point of emanation" could capture the geographic origin, as plaintiffs argue. On the other hand, a "point of procurement *** SUPPLIER" captures the concept of the company (or other entity) that supplies a good.

Although the ordinary meaning of the word does not help resolve the parties' interpretive dispute, context goes a long way toward doing so.

First, context includes surrounding words, and "[i]t is a familiar rule that the meaning of words in a statute may be clarified or confirmed by other words in the same sentence or provision." *Goodwin v. Kingsmen Plastering, Inc.*, 359 Or 694, 702, 375 P3d 463 (2016) (referring to the canon of *noscitur a sociis*); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 195 (2012) ("The Latin phrase *noscitur a sociis* means 'it is known by its associates'—a classical version, applied to textual explanation, of the observed phenomenon that birds of a feather flock together."). ORS 646.608(1)(b) makes it unlawful to cause a "likelihood of confusion or of misunderstanding as to the source, *sponsorship*, *approval*, or *certification* of real estate, goods, or services." ORS 646.608(1)(b) (emphasis added). What the italicized terms have in common is that they speak to *who* questions: sponsorships, approvals, and certifications are all things that must come from some person or organization. This suggests that the objective of ORS 646.608(1)(b) is to target conduct that causes a likelihood of confusion or misunderstanding about *who* has sponsored, approved or certified particular real estate, goods, or services. That, in turn, points to the conclusion that the word "source" in ORS 646.608(1)(b) was intended to refer to a "who"—a supplier—and not to a "what" (as in qualities or ingredients), a "where" (geographic origin) or a "how" (manufacturing processes).

Second, context includes other provisions of the same statute. *Northwest Natural Gas Co. v. City of Gresham*, 359 Or 309, 322, 374 P3d 829 (2016). In this instance, three other provisions of ORS 646.608(1) lend further support to the conclusion that "source" means supplier: ORS 646.608(1)(c), ORS 646.608(1)(d) and ORS 646.608(1)(e).

ORS 646.608(1)(c), like ORS 646.608(1)(b), targets conduct generating a "likelihood of confusion or misunderstanding"; it is the only other provision of ORS 646.608(1) that does so. It provides that it is unlawful to "cause[] likelihood of? confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another." ORS 646.608(1)(c). On its face, the provision addresses concerns about generating confusion or misunderstanding

about *who* is associated with a person's "business, vocation or occupation." *Id*. This indicates that the legislature's focus in both UTPA provisions concerned with causing a "likelihood of confusion or of misunderstanding" was on confusion regarding "who" questions, not "what," "where", and "how" questions. In that context, it would be anomalous to conclude that the word "source" alone was intended to mean geographic origin or manufacturing process, in addition to supplier, when all the other provisions have a narrower focus.

ORS 646.608(1)(d) and ORS 646.608(1)(e) also provide contextual support for the conclusion that "source" in ORS 646.608(1)(b) means supplier. ORS 646.608(1)(d) prohibits the use of "deceptive representations or designations of geographic origin in connection with real estate, goods or services." ORS 646.608(1)(d). If the legislature intended the word "source" in ORS 646.608(1)(b) to include geographic origin, ORS 646.608(1)(d) would be superfluous. Deceptive representations or designations of geographic origin almost certainly would give rise to a likelihood of confusion or misunderstanding about geographic origin, such that the conduct of using them would be fully covered by ORS 646.608(1)(b). Where one interpretation of a statute would render a provision meaningless surplusage and another would not, we generally assume that "legislature did not intend any portion of its enactments to be meaningless surplusage." *State v. Clemente-Perez*, 357 Or 745, 755, 359 P3d 232 (2015).

As for ORS 646.608(1)(e), it bars, in relevant part, "represent[ing] that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have ***." ORS 646.608(1)(e). Had the legislature broadly intended the word "source" to address the "where," "what," and "how" questions about how a good came into being, it likely would have included the word "source" in ORS 646.608(1)(e), in addition to or instead of using the words that more specifically address "who" questions: "characteristics," "ingredients," and "qualities." That is, the legislature likely would have drafted ORS 646.608(1)(e) to bar representing that "real estate, goods or services have

sources that the real estate, goods, or services do not have" if it intended "source" to have the broad meaning plaintiffs urge us to give it. That the legislature did not do so also counsels in favor of reading "source" in ORS 646.608(1)(b) narrowly to mean "supplier."

Our review of the text and context of the word "source" in ORS 646.608(1)(b) persuades us that the legislature intended it to mean "supplier." To the extent we had any remaining doubt, we note that the legislative history points in the same direction. Although not particularly helpful, that history tends to show that, in adopting ORS 646.608(1)(b) and (1)(c), the legislature understood that it was targeting conduct creating a likelihood of confusion about *who* was associated with a product, not addressing misleading conduct about other properties of the product. Notably, that history reflects that the legislature heard testimony that the point of the "likelihood of confusion" provisions was to address "the confusion between whose article it is," as distinct from confusion about "the quality of the article." Tape Recording, Senate Consumer Affairs Committee, SB 50, Feb 17, 1971, Tape 1, Sides A & B, Part I & II, (testimony of David Shannon, Director of the Metropolitan Consumer Protection Agency, testifying as an expert on consumer protection laws in Oregon; 49:36-50:25 in the digitized recording maintained at https://records.sos.state.or.us/ORSOSARCWebdrawer/Record/6001).

In arguing for a different conclusion, plaintiffs rely heavily on the fact that the primary objective of the UTPA is to protect consumers, urging us to conclude that "[t]hat purpose is best served by construing ORS 646.608(1)(b) to protect consumers and the market more generally—by preventing confusion in the market about the source, production practices, or origins of a product * * *." Doing so, however, would require us to disregard the text and context of ORS 646.608(1)(b), as well as standard rules of statutory interpretation. Perhaps more essentially, we do not perceive placing a narrower construction on ORS 646.608(1)(b) as contrary to the interests of consumers. As construed, the provision is consumer-protective: It protects consumers from purchasing products based on confusion about whose product it is. And

a narrow construction does not leave consumers vulnerable, given the fact that other provisions of the UTPA, namely ORS 646.608(1)(d) and (1)(e), address deceptive practices related to a product's geographic origins, method of production, or ingredients.

Accordingly, for the reasons stated above, the word "good" in ORS 646.608(1)(b) refers to a whole product that a defendant is alleged to have made available for personal, family or household purposes, not the component parts or ingredients of such a product. The word "source" in the same provision refers to a supplier and does not refer to the geographic origin of a product or the processes used to make it. Because plaintiffs' complaint does not allege facts showing that defendant engaged in conduct that created a likelihood of confusion as to who was supplying the products at issue, plaintiffs have not stated a claim under ORS 646.608(1)(b).

III.   CONCLUSION

For the reasons explained, plaintiffs' allegations state claims for relief under ORS 646.608(1)(d) and (1)(e), and adequately allege that plaintiffs have suffered an "ascertainable loss" under ORS 646.638(1). Plaintiffs' allegations do not state a claim under ORS 646.608(1)(b). We reverse the order on review to the extent that the trial court's decision runs counter to these conclusions and those of the Supreme Court and remand for further proceedings consistent with this opinion and with the Supreme Court's opinion.

Reversed and remanded.